COMMISSIONER OF INSURANCE *v.* CENTRAL WEST
CASUALTY CO.

1. INSURANCE—RECEIVERS—ACCEPTANCE OF BID FOR LARGEST SINGLE ASSET.

Record on appeal from order authorizing receiver of insurance company to accept bid for the largest single asset, consisting of the entire capital stock of a company organized pursuant to court order to preserve the good will, at about 77 per cent. of its appraised value *held*, not such an abuse of discretion by the trial court as to constitute reversible error where testimony as to possibility of realization of greater sum by liquidation is in dispute, to complete liquidation would require from 3 to 7 years, prospect of receiving a certain sum at present time rather than a possibly higher amount in the future appeared satisfactory to a majority of the creditors, no dividends had been paid creditors during period of some six years company was in the hands of the commissioner of insurance, no other bid was proposed by objecting creditors or any one else, trial judge reluctantly ordered acceptance of bid and offered to reopen bidding if a substantially larger bid would be offered.

2. RECEIVERS—WINDING UP—TIME.

As long as assets are not recklessly sacrificed, receiverships should be wound up within a reasonable time.

3. SAME—SALVAGE OF ASSETS AT LESS THAN VALUE.

The process of salvage in a receivership must necessarily be dictated by practical considerations, so that where sale of assets has been properly advertised, an honest endeavor made to secure bidders, opportunity afforded to reopen sale if a higher bid is produced, and no higher bid made, and there is no showing of misrepresentation, concealment, or fraud, the sale may be confirmed even though the value of the property exceeds the bid.

4. SAME—ATTEMPT TO INTEREST A PURCHASER.

It is neither fraud nor sharp practice to attempt to interest a purchaser before a public sale by a receiver is held but rather an effective method to encourage competitive bidding.

5. SAME—INSURANCE COMPANY—DISCRETION OF COURT—BUSINESS JUDGMENT.

Acceptance of offer to purchase largest single asset at public sale by receiver of insurance company at slightly more than 77 per cent. of its value on appraisal for liquidation *held*, not an abuse of discretion notwithstanding there may be some question whether it was or was not better business judgment to accept such offer.

Appeal from Wayne; Brennan (Vincent M.), J. Submitted April 18, 1939. (Docket No. 101, Calendar No. 40,445.) Decided June 5, 1939. Rehearing denied July 6, 1939.

Receivership proceeding by Charles E. Gauss, Commissioner of Insurance, against Central West Casualty Company, a Michigan corporation. On plaintiff's petition relative to sale of stock of Great Lakes Casualty Company. Objections to acceptance of bid for sale of stock filed by A. W. Shell & Company of Cincinnati, Ohio, Moore, Case, Lyman & Hubbard of Chicago, Illinois, and others. From decree ordering acceptance of bid of D. F. Broderick, Inc., a Delaware corporation, defendants A. W. Shell & Company, Moore, Case, Lyman & Hubbard, R. N. Crawford & Company, and the J. K. Company appeal. Affirmed.

*Walter I. McKenzie,* for the receiver.

*Wurzer & Higgins (John T. Higgins* and *Robert E. Sweeney,* of counsel), for D. F. Broderick, Inc.

*Robert S. Marx, Carl Runge, Lawrence I. Levi (Thomas L. Conlan,* of counsel), for appellants.

BUTZEL, C. J. Because of the financial difficulties of the Central West Casualty Company (herein referred to as the Central West), Charles E. Gauss, commissioner of insurance of the State of Michigan,

was appointed its custodian on April 4, 1933, by the Wayne county circuit court in chancery. The company had built up a very large fidelity, surety and casualty business which would have been very valuable in the hands of a responsible successor. To preserve this good will by having a solvent corporation continue the business, the Great Lakes Casualty Company (herein called the Great Lakes) was formed pursuant to a court order in June, 1933. Its capital of $300,000 and surplus of $200,100 was obtained by transferring to it assets of the Central West appraised at $500,100 at the then market value, in exchange for 30,000 shares of capital stock with a par value of $10 per share. All of the stock was turned over to the custodian of the Central West, although qualifying shares for directors were held in the names of individuals.

It was the original intention, as shown by the proposal of the insurance commissioner, to sell, with the approval of the court, the stock of the Great Lakes when it was deemed for the best interests of the creditors of Central West. At that time it was to be offered first to the stockholders of the Central West at a price equal to any offer of any *bona fide* prospective purchaser and, if no such offer was obtainable, then at a price to be determined by arbitration. The litigation leading up to the formation of the Great Lakes may be found in *Gauss* v. *Central West Casualty Co.*, 266 Mich. 159.

The underwriting of the Great Lakes increased from year to year. Its earned premiums in 1933 were $137,881. In 1937 they amounted to $793,514, and in the first nine months of 1938 to $650,334. The insurance business, however, had not been profitable for it resulted in an operating loss of $201,481.17. The loss was more than offset by a $216,685.09 gain in the value of investments due to the gradual en-

hancement in the security values from the low of 1933 to the much higher levels of September, 1938. The Great Lakes was very much handicapped by a lack of capital so that a very large portion of its business had to be reinsured in other companies and its profits therefore were very materially reduced. Its stability was also impaired somewhat because over 80 per cent. of its policies were written by five of its 50 agents. Not only did this limit the field of prospective purchasers, but the company ran a continuous risk that the greater part of its business could be suddenly transferred by the agents to a competitor.

Over five and one-half years after the appointment of the custodian of the Central West and, as stated by the trial judge, at the instance of a creditor holding a $2,500 judgment, it was finally determined that the Central West was insolvent. On October 25, 1938, a bill was filed for the appointment of a receiver, for the sale of the assets, and the winding up of the company, and for the protection and payment of the Central West creditors. Mr. Gauss was appointed receiver and an order was entered for the filing of claims against the Central West. The stock of the Great Lakes was the largest single asset of the Central West. It had also accumulated over $450,000 of cash and other valuable assets. The extent of the liabilities of the Central West had not been definitely determined but they were estimated to be $2,422,098.70. Of this amount $800,000 was claimed to be owed the State of Michigan; this included a judgment of $118,081.01 on a depository bond given to the State by the Capital National Bank on which the Central West was surety. See *State Treasurer, for the use and benefit of the State,* v. *Capital National Bank of Lansing,* 287 Mich. 188. There was also an unpaid judgment of $55,312.33, with interest, in favor of the county of Oakland. See

*Gauss* v. *Central West Casualty Co., supra; County of Oakland* v. *Central West Casualty Co.,* 266 Mich. 438.

In June, 1938, approximately five years after the Great Lakes had been organized, the insurance commissioner and others in the offices of the Great Lakes began to make efforts to sell the stock of the Great Lakes as was originally intended. Although it was recognized that the business was still valuable, reinsurance had greatly reduced its profits and additional capital was needed for successful continuation. Some 40 different firms, corporations and individuals were approached as prospective purchasers, but because of the large sums required, the range of possible customers was limited. In the early part of October, D. F. Broderick, Inc., a Delaware corporation, submitted a conditional offer of $450,000. On October 28, 1938, an order was entered directing that sealed bids be delivered and opened on November 16, 1938, for the purchase of the Great Lakes stock. The Broderick bid, which had been reduced to $440,000 on account of the expense of making an audit, was the only one made. However, the appraiser which the court appointed had not completed his appraisal at that time, and since appellants herein, A. W. Shell & Company, and others, desired to inspect the appraisal and determine whether objections would be made, the matter was adjourned until November 29, 1938, at which time appellants opposed acceptance of the bid. Hearing was had on the issue formed, testimony taken, arguments made, and finally on December 21st, an order was made authorizing the receiver to accept the offer of D. F. Broderick, Inc., to purchase all of the capital stock of the Great Lakes for $440,000.

Appellants claim that the bid price was so grossly inadequate as to shock the conscience of the court and render acceptance of the bid an abuse of judicial

discretion; that the court should not have insisted on selling the Great Lakes at a forced sale and that there was no necessity for the sale at this time; that it was sold at a price less than it could have been liquidated for; that it was an abuse of discretion to limit the time in which bids might be submitted to 18 days; that although reported to be public, the sale was in reality a private sale to a prospective purchaser at a predetermined price. They point out that the sale was neither one of foreclosure from which there would be a right of redemption, nor one where the delinquency of the defaulting debtor is' largely responsible for the sale. They condemn in various ways and by various arguments the method, fairness, and necessity of the sale, and ask that it be set aside.

It would be of little benefit to the parties or the profession to catalogue the not inconsiderable details of these transactions. We have carefully examined them, and from our examination we are unwilling to say that there was such an abuse of discretion by the trial court as to constitute reversible error. Even if the sale is considered ill-advised from a business standpoint, and of this we are by no means certain, there is no evidence of fraud, overreaching, or gross inadequacy of price. Although the results of the appraisal show a value in liquidation of $569,867.43, or $129,867.43 more than the accepted bid, the testimony leaves considerable doubt whether such an amount could have been realized. One witness testified that the realization through liquidation would be slightly less than the bid price itself; other witnesses made higher estimates. Even if as much as an additional.$130,000 could have been acquired for creditors by liquidating under the most favorable circumstances, it would have made a difference of only five or six cents on the dollar to the Cen-

tral West creditors. Furthermore, liquidation would have required from three to seven years. Appellants are correct in their statement that the larger part of the Great Lakes' assets were quickly reducible to cash, but considerable time would have been consumed before the real estate could be disposed of, mortgage loans collected, and the less liquid holdings of the company converted. The prospect of receiving a certain sum at the present time, rather than a hypothetical though higher amount in the future, appeared satisfactory to a majority of the creditors of Central West as they did not object. None of the creditors had received any dividends during the entire period of the receivership. The county of Oakland, although objecting to the sale when ordered, did not join appellants in this appeal. The State of Michigan holds claims amounting to almost a third of all claims against the Central West. An assistant attorney general of the State, who represented the insurance commissioner, reported that he had consulted the State treasurer who had advised him that if the difference between the cash amount offered and the possible sum that might be realized through prolonged liquidation was not too great, he preferred to accept the cash bid. The creditors of the Central West will eventually receive a large dividend from the receiver.

It should be remembered that no other offer for purchase of the property was proposed by appellants or anyone else. There was some suggestion that creditors be given stock in lieu of cash, but this never ripened into more than a suggestion. It was obviously impractical since there were more than 18,000 creditors of the company, many of whom held insignificant claims.

The circuit judge was extremely reluctant about accepting the bid, and did so only after hearing a

large amount of testimony. Likewise, he did all in his power to secure a better bid. Even when D. F. Broderick, Inc., threatened to withdraw its offer if the time for hearing was extended beyond the limit stated in its bid, the court extended the time. He further stated in his opinion that he had received a number of informal inquiries from persons asking whether the bids would be reopened, and that he had advised them that if there was a chance of a bid substantially larger than the one offered, he would reopen the bidding.

In the light of such circumstances we cannot say as a matter of law that the bid of D. F. Broderick, Inc., should have been rejected because of the objections of creditors holding less than 10 per cent. of the aggregate claims against Central West. Even if there were no immediate necessity for sale, the business could not be kept in receivership indefinitely, particularly since that receivership was paying no dividends to creditors. As long as the assets are not recklessly sacrificed, receiverships should be wound up within a reasonable time and the process of salvage must necessarily be dictated by practical considerations. Where a sale has been properly advertised, and an honest endeavor has been made to secure bidders, where an opportunity is afforded to reopen the sale if a higher bid is produced, and no higher bid is made, and where there is no showing of misrepresentation, concealment or fraud, the sale may be confirmed even though the value of the property exceeds the bid. See *Detroit Trust Co.* v. *Hart,* 277 Mich. 561.

While appellants claim irregularity because a bidder was first obtained and the stock subsequently offered at public sale with comparatively short notice, they have failed to show that there was anything improper in the method pursued. It is neither

fraud nor sharp practice to attempt to interest a purchaser before a sale is held; indeed, it is an effective way to encourage substantial and competitive bidding. While there possibly may be some question whether it was or was not better business judgment to accept the offer, we find that there was no abuse of discretion whatsoever in confirming the sale.

The order confirming the sale is affirmed, with costs to appellees.

WIEST, BUSHNELL, SHARPE, POTTER, CHANDLER, NORTH, and McALLISTER, JJ., concurred.